UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 121 BARNES STREET, NEW BRITAIN, CONNECTICUT | Case No. 3:23MJ 975 (TOF) **Filed Under Seal** November 10, 2023 |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Tyler Billings, being duly sworn, state:

## INTRODUCTION

1.      I am assigned to Homeland Security Investigations (HSI), in Burlington, Vermont as a Task Force Officer (TFO). HSI is the investigative arm of the Department of Homeland Security (DHS). HSI is responsible for enforcing over 400 federal criminal statutes of the United States. I am a law enforcement officer in the State of Vermont, and I am authorized by law to conduct investigations and to make arrests for felony offenses. I have been a full-time Certified Law Enforcement Officer in the State of Vermont since 2017 and I have been a TFO with HSI since October 2022, assigned to the HSI Rutland office. I am also a Detective for the Rutland City Police Department (RPD).

2.      I attended and graduated from the Vermont Police Academy in 2017. As a full-time Certified Law Enforcement Officer and HSI TFO, I have conducted and assisted in investigations regarding violent crime, child exploitation, fraud, money laundering, and drug trafficking. In connection with my duties as a RPD Detective and HSI TFO, I have participated in various aspects of investigatory work, including undercover surveillance and controlled narcotics purchases with the use of confidential informants, and I have participated in several narcotic-related arrests and the execution of narcotic-related search warrants. I have also written affidavits

1

in support of applications for various types of search warrants and arrest warrants.  As a result of my participation in these investigations, I am familiar with the techniques employed by distributors of controlled substances and their means of acquiring, transporting, storing, preparing, and distributing controlled substances; and their means of collecting, transporting, and transferring the proceeds of controlled substances.

3.      Law enforcement has determined that Bayohan MANGUAL discharged a firearm during a botched drug robbery in Rutland, Vermont, killing one of the robbers and severely wounding the other.  I submit this affidavit in support of an application for a search warrant, pursuant to Federal Rule of Criminal Procedure 41, authorizing the search of a residence located at 121 Barnes Street, in New Britain, Connecticut (SUBJECT PREMISES).  Based on the facts set forth in this affidavit, I believe there is probable cause to search the SUBJECT PREMISES for Bayohan MANGUAL, a person to be arrested; and for evidence of a crime, contraband, fruits of a crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing a crime relating to violations of 18 U.S.C. § 922(g)(1), being a felon in possession of firearms and ammunition; and 18 U.S.C. § 924(c), possessing and discharging a firearm in furtherance of drug trafficking.  The items to be seized from the SUBJECT PREMISES are listed in Attachment B.

4.      121 Barnes Street (SUBJECT PREMISES) is a two-story single-family residence with a cream-colored exterior, located in New Britain, Connecticut, and described in greater detail in Attachment A. 121 Barnes Street (SUBJECT PREMISES) is located on the southwest side of Barnes Street.  The SUBJECT PREMISES has a white exterior door labeled with a number 2.

5.      The information contained within this affidavit is based upon my training, experience, and personal participation in the investigation, as well as information that has been conveyed to

me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, I have not included each and every fact known to me concerning this investigation. Unless otherwise specified, any witnesses' statements included below are related in sum and substance and are not intended to be quotations.

## Probable Cause

### Background of the Target

6.     I have reviewed MANGUAL's criminal history and observed that MANGUAL has two prior federal felony convictions in the District of Connecticut for controlled substance offenses.  Specifically, MANGUAL was sentenced in 2014 to 48 months' imprisonment after having pleaded guilty to violations of 21 U.S.C. § 841(a)(1) involving cocaine base.  In 2017, MANGUAL was sentenced to 33 months' imprisonment after having pleaded guilty to a violation of 21 U.S.C. § 841(a)(1) involving cocaine base.  MANGUAL also has a criminal history in the State of Connecticut, including a 2008 felony conviction for carrying a firearm without a license, and a 2013 misdemeanor conviction for violating Pennsylvania's controlled substance, drug, device, and cosmetic act.

### Incident at 50 Cherry Street

7.     On September 2, 2023, at approximately 3:52 p.m., RPD uniformed patrolmen responded to 50 Cherry Street, Apartment 2, in Rutland City, Vermont (the "Residence").  RPD units were responding to reports of a male outside the residence who was bleeding and reportedly assaulted.  At approximately 4:03 p.m., RPD Detective Corporal Lucia received a call from central dispatch advising of a homicide at the Residence.  Central dispatch advised that units were dispatched to a group of individuals beating a male outside of the Residence.  On arrival, units discovered a male, later identified as                    of Albany, New York, suffering from

gunshot wounds outside of the Residence.  Officers cleared the Residence, and upon clearing the Residence, discovered inside a deceased male, later identified as ████████████ of Atlanta, Georgia.  ███████ appeared to have suffered from gunshot wounds.

8.     On arrival RPD Detective Corporal Lucia met with RPD Sergeant Rose, who advised the injured male, later identified as ██████ did not tell officers who had shot him, just that the person was light skinned. RPD Sergeant Rose advised that neighbors stated four people left the residence after "beating" the injured male. Neighbors also reported seeing a white male pushing a white female in a wheelchair leave the residence.

9.     A white 2023 Chevrolet Malibu bearing New York registration LCH 2161VIN: 1G1ZD5STR6PF215415 was running outside the Residence. RPD Detective Menjivar learned that the vehicle was rented from Albany International Airport on August 29, 2023, by ████ the deceased male. ████████ the injured male, also indicated to a witness that the white Chevrolet Malibu was his vehicle.

**<u>Search of 50 Cherry Street Apartment 2</u>**

10.     A Vermont state search warrant was granted and conducted at the Residence.  The Residence is a one-bedroom second-floor apartment.  The front door to the apartment accesses the kitchen and in close proximity to the entry door is the door to a small bedroom.  During the search of the Residence, members of the Vermont State Police Crime Scene Search Team (VSP CSST), located a firearm near ██████ body, and spent shell casings inside the Residence, to include Speer 9mm Luger casings and Winchester 9mm Luger casings.  Due to the recovery locations of the casings, it was the opinion of VSP CSST that the shooter shot from inside the small bedroom toward the kitchen area, and that rounds were not fired from outside the bedroom into the bedroom.

11.     Based upon this opinion by VSP CSST, the location of ▨▨▨ deceased body, witness statements recounted below, and other evidence, law enforcement believes ▨▨▨ did not discharge any rounds from the recovered firearm, that ▨▨▨ shooter (MANGUAL) discharged all of the expended rounds, and that the shooter (MANGUAL) fled the Residence.

### History of the Residence

12.     The Residence has a history of narcotics activity.  A search warrant for narcotics sales was conducted on the Residence on January 13, 2023, by the Rutland City Police Department. The Residence had also been a location of interest for the Rutland City Police Department in the past several months, due to continued complaints of suspected narcotics distribution.

13.     During the shooting investigation, surveillance footage was collected from the surrounding area of the Residence. The surveillance footage depicts several individuals running from the area of the Residence at approximately 3:47 p.m. on September 2, 2023. The first individual was a light-skinned male in dark colored pants and wearing what appeared to be a teal-colored hoodie.  The second individual was a white female with a small dog, later identified as ▨▨▨  The third individual was a white male wearing a Nirvana shirt, later identified as ▨▨▨  The last individual was a white female wearing a white hoodie and dark skirt, later identified as ▨▨▨  Surveillance footage in the area also depicts a white male, later identified as ▨▨▨ pushing a white female in a wheelchair, later identified as ▨▨▨

14.     Still images from surveillance footage showing the male in the teal hoodie are below:



15.     While reviewing the security footage from the area of Forest and Union Street, RPD Detective Corporal Lucia observed the male in the teal-colored hoodie running eastbound and carrying a bag. While running, the male in the teal-colored hoodie appeared to place an item inside the bag. RPD Detective Corporal Lucia slowed down the footage and observed that the item appeared to be a black handgun.

**Interview on September 2, 2023.**

16.     Later that evening ▓▓▓ arrived at the Rutland City Police Department, and spoke with RPD Detective Corporal Lucia and Commander Samson Delpha. ▓▓▓ provided a sworn statement recorded by audio and video, and advised the following, among other things:

     a.   ▓▓▓ went to 50 Cherry Street to buy cocaine base. ▓▓▓ was walking towards the bathroom when people came in and chaos ensued. ▓▓▓ heard "bickering" then gunshots. ▓▓▓ ran into the living room and stayed in the living room. A male opened the curtain to the living room, and advised "come on let's go." ▓▓▓ ran

out of the residence and saw blood going down the stairwell, and observed a male at the bottom of the stairs.

b. Regarding the male who said "let's go," ████ advised she did not know the male's name or street name. ████ described the male as black. The male running in front of ████ in the surveillance footage was the male who said "let's go." ████ advised this was the male she was going to see that day, indicating that was who she was getting narcotics from. ████ was shown an unmarked still from the surveillance footage depicting the male running ahead of her. ████ advised the male in the photograph was "the plug" (slang for supplier), meaning the same male who she was going to buy drugs from.

**Identification of Male in Surveillance Footage by SOI**

17.     On September 4, 2023, RPD Detective Corporal Lucia met with a SOI in Rutland. The SOI was shown an unmarked still from the surveillance footage depicting the male wearing the teal hoodie. SOI advised the subject in the photo was a known drug dealer identified as "Drake." Through prior law enforcement interactions and knowledge, RPD Detective Corporal Lucia knew "Drake" to be a dealer of drugs in the Rutland area, specifically at ████ ████ and ████ from approximately January 2023 to April 2023.

**Controlled Purchase Conducted by SVDTF Involving "Drake" and 802-353-1818**

18.     The Southern Vermont Drug Task Force (SVDTF) conducted a controlled purchase of cocaine base from "Drake" at ████ in Rutland City, Vermont on or about January 5, 2023.  To coordinate the controlled purchase, the confidential informant (CI) contacted "Drake" on the number which the CI had saved for "Drake," 802-353-1818.  The CI called "Drake" at 802-353-1818 while he was with SVDTF Detective Jesse Dambrackas and asked

when "Drake" was stopping by, as CI had previously contacted "Drake" to tell him he would need to see him to get a "half basket" (street slang for approximately 1.75 grams of cocaine base) soon. "Drake" directed the CI to meet him at ███████████████, where they had met in the past, and which the CI identified as ████████ apartment.  The CI went to ████████ under law enforcement surveillance.  After returning to law enforcement's presence, the CI stated it had paid "Drake" $120 for approximately 2.2 grams, including packaging, of a substance that tested presumptively positive for cocaine base during a field test using a TruNarc narcotics analyzer.  CI described "Drake" as an athletic male with longer dreadlocks that are dyed blonde.

### Rutland Probation Officer Information about 802-353-1818

19.     On September 7, 2023, RPD Detective Corporal Lucia learned from state Probation Officer Nicholas Daigle that an individual identified as ████████ included the phone number 802-353-1818 with the name "Drake Finesse" on an Inmate Telephone System Number Request Form at the Marble Valley Regional Correctional Center.  Through prior law enforcement actions, RPD Detective Corporal Lucia had developed reason to believe that ████ had ties with "Drake."

### Identification of Male in Surveillance Footage by ████████

20.     On September 7, 2023, PO Daigle and RPD Detective Corporal Lucia met with a male identified as ████████ Through prior law enforcement intelligence, RPD Detective Corporal Lucia knew ████ to have had ties with "Drake." ████ provided a sworn statement recorded by audio and video.  Among other things ████ was shown the unmarked still from the surveillance footage depicting the male in the teal hoodie leaving the area of the Residence. ████ advised he was 100% sure the individual in the photo was "Drake."

**Information from** ▓▓▓▓▓▓▓▓ **about "Drake"**

21.     On September 8, 2023, RPD Detective Corporal Lucia received a phone call from Massachusetts State Trooper Timothy Alben. Trooper Alben advised he had conducted a motor vehicle stop during which narcotics were located.  Trooper Alben later advised approximately 7 grams of suspected raw fentanyl was seized from the vehicle. One of the individuals in the vehicle was ▓▓▓▓▓▓▓▓  Through law enforcement encounters and intelligence, RPD Detective Corporal Lucia knew ▓▓▓▓▓ to be an associate of "Drake." ▓▓▓▓▓ told Trooper Alben he had just met with "Drake" at the MGM Casino in Springfield, Massachusetts. ▓▓▓▓▓ advised that 802-353-1818 was "Drake's" number.

22.     On September 9, 2023, RPD Detective Corporal Lucia learned from RPD Corporal Sean Maguire that ▓▓▓▓▓▓▓ had been placed into custody in Rutland, Vermont for a possession charge, and was requesting to speak with RPD Detective Corporal Lucia about the homicide at 50 Cherry Street Apartment 2. ▓▓▓▓▓▓ had approximately 0.39 grams of presumptively positive crack cocaine and approximately 3.34 grams of suspected narcotics on his person, as well as other unknown substances and suspected narcotics in his backpack.  RPD Detective Corporal Lucia went to RPD and met with ▓▓▓▓▓▓▓▓ waived his Miranda rights and agreed to speak with RPD Detective Corporal Lucia. The conversation was electronically recorded.  Among other things, ▓▓▓▓▓ advised the following:

a.     "Drake" was selling narcotics, specifically "hard" and fentanyl, out of 50 Cherry Street.  (From my training and experience, I know "hard" to be a commonly-used term for cocaine base.)  The previous day ▓▓▓▓▓ went down to the MGM Casino in Springfield, Massachusetts, met "Drake," picked up five grams, and would need to bring back $600 to keep things "rolling" with "Drake."  (Through

RPD Detective Corporal Lucia's training, experience, and knowledge of ████████ RPD Detective Lucia understood ████████ was speaking about receiving narcotics from "Drake.")

b. ████████ was not at 50 Cherry Street Apartment 2 on September 2. ████████ spoke to "Drake" three nights before his RPD interview (which would be September 6) and learned information about the homicide directly from "Drake," including that ████ showed up to the Residence 45 minutes after having bought drugs earlier from "Drake" at 50 Cherry Street. ████ let ████ in, and the two black males pushed their way into the residence. The males made ████ go to the living room. The males went to the bedroom and knocked on the door. The males told "Drake," who ████████ also referenced as "Dude," "to give it up". "Drake" told the males it was all right here, and he had it all. "Drake" told ████████ he had his gun underneath the "work," and picked the gun up and shot the male who entered the room. Through my training and experience, I know the term "work" to be in reference to narcotics that dealers are actively selling.

c. ████████ advised "Drake" told him the first guy did not even see it coming. "Drake" had cracked the door open and saw the males before they entered and had set his gun up underneath his drugs. "Drake" did not tell ████████ what gun he used, but the last guns ████████ knew "Drake" to have had been a 9mm and a .45. ████████ advised one of the guns did not have a safety, and "Drake" always had "one in the clip."

d. ████████ advised he has seen "Drake" with guns, but had never seen him threaten anyone with them. ████████ advised the guns were for "Drake's"

10

protection. "Drake" would commonly bring up to 1,000 grams of "hard" and 500 grams of "dope" to Vermont. ████████ advised this was the common amount "Drake" would bring up, and that he would be up at least 3 weeks out of a month.

e.  RPD Detective Corporal Lucia showed ████████ the unmarked still of the surveillance footage of the male in the teal hoodie who ran from the area of the Residence. ████████ identified the male in the photo as "Drake" and said he was 97% sure on the identification of the photo.

f.  ████████ stated he had spoken with "Drake" and arranged to meet with him to pick up drugs. ████████ advised "Drake" did not want to travel to Rutland due to the shooting at 50 Cherry Street. ████████ advised "Drake" directed him to go to Massachusetts to pick up the drugs from "Drake." ████████ and his friend met with "Drake" in the parking deck of the casino. ████████ first advised only his friend got out of the vehicle and met with "Drake," but ████████ later advised both he and his friend got into the vehicle "Drake" was in to get the drugs from him. ████████ described the vehicle as a black SUV.

g.  ████████ advised he had dropped "Drake" off in the casino in Massachusetts and at casinos in Connecticut, in the past. ████████ advised that law enforcement should let him leave with the drugs he possessed in Rutland because he needed to sell them for "Drake," which RPD Detective Corporal Lucia understood to mean that ████████ obtained the drugs from "Drake."

██████████████████ **Infiniti**

23.     MGM Springfield Security provided surveillance footage of the parking garage that showed the vehicle which ██████ approached and that ██████ reported "Drake" was in.  The vehicle's license plate, Connecticut registration BH47050, came back to a blue 2019 Infiniti Qx60 Luxe registered t ████████████ of New Britain, Connecticut.

24.     Records from the Commonwealth of Massachusetts Fusion Center show that, according to license plate readers, on September 2, 2023, ██████ Infiniti was traveling north on I-91 at approximately 4:43 p.m. near Longmeadow, Massachusetts and at approximately 5:00 p.m. in East Hampton, Massachusetts.  This travel would be consistent with the vehicle traveling north from Connecticut to retrieve MANGUAL from Vermont after the shooting.

**New Britain Police Department Information about MANGUAL**

25.     On September 11, 2023, RPD Detective Corporal Lucia spoke with New Britain Police Detective Thai-n Tran regarding ██████ Detective Tran identified a police report regarding ██████ that identified ████████ as Bayohan MANGUAL. Detective Tran provided RPD Detective Corporal Lucia a photo of MANGUAL. RPD Detective Corporal Lucia observed the photo to be substantially similar to the surveillance still and surveillance video of "Drake."

**Identification of MANGUAL Photo by** ████████

26.     On September 12, 2023, PO Daigle and RPD Detective Corporal Lucia met with ████████ at Marble Valley Regional Correctional Center. ██████ waived his Miranda Rights and agreed to speak with PO Daigle and RPD Detective Corporal Lucia. ██████ provided a sworn audio recorded statement. RPD Detective Corporal Lucia showed ██████ an unmarked photo of

MANGUAL. ▮▮▮ identified the photo of MANGUAL as being "Drake." ▮▮▮ advised he was 100% sure the person in the photo was "Drake."

**Information from ▮▮▮ about "Drake"**

27.    On September 12, 2023, RPD Detective Corporal Lucia arrested ▮▮▮ on unrelated charges. ▮▮▮ waived her Miranda Rights and agreed to speak with Detective Corporal Lucia. ▮▮▮ provided a sworn statement recorded by audio and video, and advised the following, among other things:

a.    ▮▮▮ knew "Drake." "Drake" used to sell drugs out of her apartment located at ▮▮▮ Through prior law enforcement interactions and intelligence, RPD Detective Corporal Lucia knows ▮▮▮ to be an associate of "Drake." ▮▮▮ was shown an unmarked still from the surveillance footage depicting the male wearing the teal hoodie. ▮▮▮ identified the subject in the photo as "Drake." ▮▮▮ was also shown an unmarked photo of MANGUAL. ▮▮▮ identified the subject in the photo as "Drake."

b.    ▮▮▮ provided consent to search her cell phone. While reviewing data from ▮▮▮ phone, RPD Detective Corporal Lucia observed the contact "Drako." The number for "Drako" was listed as 802-353-1818.

**ATF Nexus Determination**

28.    RPD Detective Corporal Lucia provided Special Agent Eric Brimo of the Bureau of Alcohol, Tobacco, Firearms and Explosives with photographs of one round of the Speer 9x19 ammunition and one round of the Winchester 9x19 ammunition recovered at the Residence on September 2, 2023.  SA Brimo, who is an ATF-designated expert in the interstate nexus of firearms and ammunition, opined that both items were ammunition and both items were manufactured

outside the state of Vermont and therefore, by their presence in the state of Vermont, previously traveled in interstate and/or foreign commerce.

## Indictment

29.     On October 18, 2023, a federal grand jury sitting in Rutland, Vermont issued an indictment charging MANGUAL with, on or about September 2, 2023, knowingly possessing ammunition in and affecting interstate commerce, while knowing that he had been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  An arrest warrant was issued in connection with the indictment.  Thus, MANGUAL is a person to be arrested within the meaning of Federal Rule of Criminal Procedure 41(c)(4).  The indictment and arrest warrant are under seal until MANGUAL is arrested.

## Information Linking MANGUAL to 121 Barnes Street, New Britain, Connecticut

30.     Investigators learned that telephone number 860-977-6054 had previously been listed as MANGUAL's phone number when he registered for a U.S. passport, was listed on loan documentation from PenFed Credit Union related to MANGUAL's auto loan, and was listed on a Greenwood Credit Union credit application by MANGUAL.  The number, 860-977-6054, is a wireless number associated with Verizon Wireless.  Records from Verizon obtained by RPD Detective Corporal Lucia pursuant to a September 20, 2023 Vermont Superior Court search warrant related to that phone number, from August 1, 2023 to September 19, 2023, reflect that MANGUAL is listed as the subscriber and 121 Barnes Street, New Britain, Connecticut is listed as the address associated with that phone number.

31.     According to records obtained from PenFed Credit Union, MANGUAL listed 121 Barnes Street, New Britain, Connecticut (SUBJECT RESIDENCE) as his address on PenFed Credit Union auto loan paperwork on or about April 13, 2022.  According to records obtained from

Greenwood Credit Union, MANGUAL listed 121 Barnes Street, New Britain, Connecticut (SUBJECT RESIDENCE) as his address on Greenwood Credit Union auto loan paperwork on or about August 16, 2022.

32.     MANGUAL is currently on federal supervised release in the District of Connecticut.  RPD Detective Corporal Lucia spoke with one of MANGUAL's supervising probation officers on September 25, 2023, and learned that 121 Barnes Street in New Britain (SUBJECT RESIDENCE) is the address where MANGUAL has told Probation that he is residing. The supervising probation officer last visited MANGUAL at 121 Barnes Street in New Britain on September 22, 2023.

33.     On October 25, 2023, RPD Detective Corporal Lucia, along with members of HSI Rutland and HSI Hartford, conducted surveillance on 121 Barnes Street, New Britain, Connecticut (SUBJECT RESIDENCE). While surveilling the SUBJECT RESIDENCE, RPD Detective Corporal Lucia and I observed a young juvenile female get onto a school bus from the residence. A few hours later, HSI Hartford personnel observed a juvenile male who appeared to be in the teenage age range exit the SUBJECT RESIDENCE and get onto a school bus.  RPD Detective Corporal Lucia contacted US Probation and Parole who advised that when visiting MANGUAL in September, a teenage male was present. Probation advised the teenage male was _____

34.     During surveillance, RPD Detective Corporal Lucia observed a dark colored vehicle in the driveway of the SUBJECT RESIDENCE.  The vehicle was bearing Connecticut registration BB09187.  A records check of the vehicle identified it as a 2015 Honda Crosstour EX-1, registered to _____ It should be noted that the registration indicated a _____ _____ New Britain, Connecticut address.

35.     During the course of the investigation, RPD Detective Corporal Lucia was granted search warrants from Vermont Superior Court for two phone numbers connected to MANGUAL. One phone was serviced by AT&T and the number was listed as 802-353-1818, which as discussed above, is believed to be MANGUAL's drug-customer phone number. The other phone number was a Verizon Wireless phone with phone number 860-977-6054, which as discussed above, is believed to be MANGUAL's personal phone number. While reviewing the location data, Detective Corporal Lucia determined that at different times, both numbers listed above were within the area of the SUBJECT RESIDENCE.

36.     For example, location data for the number 802-353-1818 indicates that on August 29, 2023, the phone was in New Britain, Connecticut, specifically W Main Street with a 200m radius.  121 Barnes Street, New Britain, Connecticut (SUBJECT RESIDENCE) is within a mile of the ping coordinates.

37.     While further reviewing location data for the number 802-353-1818, RPD Detective Corporal Lucia observed on September 3, 2023, a day after the homicide, the phone was in Rutland, Vermont, specifically Strongs Avenue with a 600m radius. It should be noted, within the area of 50 Cherry Street Apt 2, Rutland, Vermont, where the homicide took place, is located just over the 600m radius by about a quarter mile.  Data has not yet been obtained from the provider regarding location data for number 802-353-1818 after September 3, 2023.

38.     While further reviewing tower location data for the Verizon Wireless phone with phone number 860-977-6054, on September 2, 2023, the day of the shooting at the Residence, at approximately 3:51pm, the phone connected to a tower on Merchants Row in downtown Rutland City, Vermont.  At 5:53pm, the Verizon Wireless phone with phone number 860-977-6054 is connected to a tower near North Clarendon, Vermont, a town south of Rutland City.  At 10:20pm,

Verizon Wireless phone with phone number 860-977-6054 is connected to a tower near Shelburne Falls, Massachusetts.  At 11:05 pm, the Verizon Wireless phone with phone number 860-977-6054 is connected to a tower located in Hartford, Connecticut.  The Verizon Wireless phone with phone number 860-977-6054 appears to remain in the Hartford, Connecticut area until at least 10:19am on September 3, 2023.  At 11:12am on September 3, 2023, the Verizon Wireless phone with phone number 860-977-6054 connected to a tower located at 1 Hartford Square, New Britain, Connecticut.  This tower is located less than 2,000 feet from the SUBJECT RESIDENCE, and consistent with the Verizon Wireless phone with phone number 860-977-6054 being used at the SUBJECT RESIDENCE.

39.     On or about October 31, 2023, a pole camera was installed near 121 Barnes Street, New Britain, Connecticut (SUBJECT RESIDENCE).  While reviewing pole camera footage, RPD Detective Corporal Lucia observed a blue Infiniti SUV leave the SUBJECT RESIDENCE after 10:00 a.m. on or about November 4, 2023.  The Infiniti returned to the SUBJECT RESIDENCE around 11:38 a.m.  It should be noted this vehicle matches the description of blue 2019 Infiniti Qx60 Luxe registered to ████████████████ of New Britain, Connecticut.

40.     On November 1, 2023, I obtained a sealed search warrant for location information pertaining to the device assigned phone number 860-977-6054 in the District of Connecticut in docket number 3:23mj960(TOF).  Data from that search warrant shows that the 860-977-6054 phone has been in the area of 121 Barnes Street, New Britain as recently as the morning of November 7, 2023.

## Training and Experience

41.     Based on my training and experience, I know that many individuals who have committed a criminal act, such as a shooting, may dispose of some items connected with the act but usually do not discard all items related to the act.  For example, individuals may keep personal items such as clothing items, shoes or a bag, even if they possessed them during the criminal act. These items may be stored at a person's residence.  In this instance, I believe it is probable that items worn and carried by MANGUAL after the September 2, 2023 shooting are currently stored at the SUBJECT RESIDENCE.

42.     I know that individuals involved in criminal activity commonly maintain names of associates and contact information in notebooks, ledgers, cell phones, electronic devices (such as tablets), and other electronic digital storage media. These contact data often include phone numbers, names, email addresses, and locations.  In this instance, I believe that MANGUAL may have records, either digitally or in hard copies, that include records of past dealings with Rutland-area drug customers, including people identified above.

43.     I know that individuals selling and distributing controlled substances frequently keep paraphernalia used in preparing and packaging drugs at their residences or other locations where those activities take place, including scales, cutting agents, brick- or pill-presses, packaging materials, and instruments for consumption.  I know that this is true even if individuals distributing controlled substances do not have controlled substances in their possession at the time.

44.     I know that drug distributors frequently take or appear in photographs of themselves, their associates, their property, their products, and particularly the proceeds from the distribution of their products. These distributors often maintain these photographs in their residences or in properties they own or rent, or on their digital devices.

45.     I know that distributors of controlled substances who have amassed proceeds from the sales of drugs will often attempt to conceal the nature and sources of the proceeds. Drug distributors often use, among other things, banks and their attendant services, wire transfers, money drafts, real estate or vehicle transactions, shell corporations and their business funds, and cryptocurrencies to obscure the nature and ownership of the funds. Individuals involved also frequently obscure their ownership of properties by registering them to or titling them in the names of family, friends, or associates. Records evidencing such services, items, and transactions are frequently maintained where the distributors have ready access to them, particularly in their residences or the residences of those they trust.

46.     I know individuals involved in criminal activity frequently maintain several cellular telephones, rotating through the devices and assigned numbers periodically to thwart law enforcement efforts. Frequently the contact information noted above is contained in the cellular telephones, as are text messages or messages from other services (such as Facebook and WhatsApp) showing conversations about criminal activity. The phones often also contain the types of photographs mentioned above.   In this instance, MANGUAL's possession of a "customer phone" and a "personal phone" is consistent with my training and experience of how drug traffickers operate.

47.     I know individuals involved in criminal activity commonly have in their possession (that is, on their persons, in their vehicles, and at their residences) firearms and ammunition to protect themselves, their controlled substances, and the proceeds from distributions. Those firearms often include pistols, revolvers, rifles, and shotguns, and they occasionally include machine guns, silencers, or other restricted weapons.   Individuals involved in criminal activity also have firearm accessories and other evidence of firearm possession such as holsters, magazine pouches, magazines, gun cleaning supplies.   Drug distributors will also frequently trade controlled

substances for other goods, to include firearms.  Based on my training and experience, I know that federal firearms laws do not restrict prohibited people from purchasing firearm accessories.  As such, even a felon like MANGUAL may lawfully purchase these items.  Purchases of these items may result in receipts and other records, both physical and digital, which may be located at MANGAUL's residence.

48.     Based on my training and experience, digital and physical records (including receipts) can provide evidence of a person's physical location.  Receipts from purchases for food, gas, and other items may show presence in a particular geographic area, and a path of travel.  In this matter, such records may show MANGUAL's physical presence in the Rutland area on and around the date of the shooting under investigation.  They may also show MANGUAL's travel path back from Vermont to Connecticut in the days after the shooting.  Finally, such records also may provide evidence of other locations where evidence may be secreted, including storage units.

### Conclusion

49.     For the reasons set forth in this affidavit, probable cause exists to believe that Bayohan MANGUAL has committed violations of violations of 18 U.S.C. § 922(g)(1), being a felon in possession of firearms and ammunition; and 18 U.S.C. § 924(c), possessing and discharging a firearm in furtherance of drug trafficking.  Further, probable cause exists to believe that the SUBJECT PREMISES contains evidence of these criminal offenses; that the SUBJECT PREMISES contains contraband, fruits of these crimes, and other items illegally possessed, and that the SUBJECT PREMISES contains property designed for use, intended for use, or that has been used in committing these crimes.  There is also probable cause to search the SUBJECT PREMISES for MANGUAL, a person to be arrested.

50.     Accordingly, I request that the Court issue the requested search warrant.

Respectfully submitted,

TYLER L
BILLINGS

Digitally signed by TYLER L
BILLINGS
Date: 2023.11.10 13:31:32 -05'00'

TYLER BILLINGS
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to before me over the telephone
this 10th day of November, 2023, in Hartford, Connecticut.

Date: 2023.11.10
14:03:14 -05'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Premises to be Searched – SUBJECT PREMISES

The premises to be searched are described as follows and include the residence and attached garage and all locked and closed containers and vehicles found therein: the residential property located at 121 Barnes Street, New Britain, Connecticut. The residential property is a two-story, cape style single-family residence, with an attached two car garage, and cream-colored exterior. The residence is located on the southwest portion of Barnes Street, and accessed by two exterior doors on the front of the residence. The below photograph is a fair and accurate depiction of the residence.



Photo depicts the front of the residence, from Barnes Street.

## ATTACHMENT B

### Items to be Seized

I.  Any evidence, contraband, fruits, or other items illegally possessed, and property designed for use, intended for use, or used in committing a crime relating to violations of 18 U.S.C. § 922(g)(1), being a felon in possession of firearms and ammunition; and 18 U.S.C. § 924(c), possessing and discharging a firearm in furtherance of drug trafficking, including:

   a.  Any records related to the acquisition, possession, distribution, or transportation of any firearms, suspected firearms, ammunition, or firearm accessories;

   b.  Address books, telephone directories, notes, maps, correspondence, customer lists and records, suppliers' lists and records, delivery forms and records, mailing receipts, and records relating to domestic and foreign travel such as tickets, passports visas, travel schedules, or correspondence;

   c.  United States Currency or Crypto Currencies and all records pertaining to the currency;

   d.  All cellular phones, tablets, computers, and other electronic devices reasonably associated with MANGUAL, including electronic devices that are capable of storing data, such as text messages, messages sent via social networking sites (such as Facebook, Twitter, Instagram, and others), emails, cryptocurrency transaction data (including bitcoin wallets), video files, audio files, digital photographs, and electronic records;

   e.  Containers (such as safes, file cabinets, and lockboxes) that are locked;

   f.  Records and information relating to the identity and residency of individuals associated with the premises, including utility records and other bills showing money owed or previously paid;

   g.  Records and information relating to the location of MANGUAL from August 1, 2023 to September 30, 2023, including receipts, ticket stubs, and photographs;

   h.  Any clothing or items matching the descriptions of what MANGUAL was wearing or carrying on September 2, 2023;

   i.  Any and all firearms, suspected firearms, and ammunition; and

   j.  Any and all firearm accessories and evidence of firearm possession, such as holsters, magazine pouches, magazines, gun cleaning supplies.